UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

NORTHERN DIVISION

**FILED**

MAR 28 2017



CLERK

| | |
|---|---|
| NORTHERN VALLEY COMMUNICATIONS, L.L.C., A SOUTH DAKOTA LIMITED LIABILITY COMPANY,<br><br>Plaintiff,<br><br>vs.<br><br>AT&T CORP., A NEW YORK CORPORATION,<br><br>Defendant. | 1:14-CV-01018-RAL<br><br>OPINION AND ORDER GRANTING IN PART AND DENYING IN PART CROSS-MOTIONS FOR SUMMARY JUDGMENT |

Northern Valley Communications, LLC (NVC) filed this collection and declaratory judgment action against AT&T Corp. (AT&T), alleging that AT&T was unlawfully withholding payment for telecommunications services provided by NVC to AT&T. Doc. 1. NVC's complaint has four claims for relief: 1) a collection action based on NVC's tariffed charges for interstate and intrastate switched access services provided to AT&T, but not fully paid since March 2013; 2) in the alternative, a state law quantum meruit claim if the charges cannot be recovered under NVC's tariffs; 3) in the alternative, a state law unjust enrichment claim if the charges cannot be recovered under NVC's tariffs; and 4) a declaratory judgment action seeking to require AT&T to pay NVC's invoices in the future. Doc. 1 at 11–14.[1] AT&T filed a motion for partial judgment on the pleadings, Doc. 33, and an amended answer and counterclaim against NVC that consists of a long argument of why AT&T believes that NVC ought not to recover,

---

[1] This Court uses "Doc." to refer to the document number in the Court's CM/ECF filing system, followed by the page number assigned at the top of the CM/ECF filing. With regard to some of the parties' filings, the CM/ECF page number cited from the top of the document varies from the page number at the bottom of the given page.

Doc. 52 at 1–51. AT&T's counterclaim ultimately made three claims for relief: 1) that NVC was unlawfully billing for services under the rules and orders of the Federal Communication Commission (FCC); 2) that NVC was billing for services that violated its own tariffs; and 3) that AT&T is entitled to a declaratory judgment on its first two claims thereby relieving AT&T of any obligation to pay the disputed charges. Doc. 52 at 46–49. After a motion hearing, this Court denied AT&T's motion for partial judgment on the pleadings. Doc. 60.

Both parties simultaneously moved for partial summary judgment. Docs. 80, 84. AT&T seeks summary judgment on all four of NVC's claims for relief, and summary judgment on the liability portions of its own Counts I and II in its counterclaim. Doc. 80 at 1. NVC seeks summary judgment on Counts I and IV of its Complaint, or on Count II of its Complaint in the alternative, and summary judgment on each of AT&T's counterclaims. Doc. 84 at 1. This Court read extensive filings and held a lengthy hearing on the cross-motions for summary judgment. Doc. 119. The parties' disagreement relates primarily to application of the law to facts not actually in dispute. For the reasons explained below, this Court grants NVC's motion for summary judgment on Count I of its complaint in part, grants AT&T's motion for summary judgment on Counts II and III of NVC's Complaint, denies at this time NVC's motion for summary judgment on Count IV of its Complaint, denies AT&T's motion for summary judgment on its counterclaim, and grants in part and denies in part NVC's motion for summary judgment on AT&T's counterclaim.

## I.   Background

### A. FCC Telecommunications Regulatory Framework

This case involves a dispute between two types of telecommunications carriers. NVC is a local exchange carrier (LEC), which provides telephone services to local residents and

businesses.   AT&T is an interexchange carrier (IXC), which is responsible for carrying telephonic traffic between LECs in different geographic areas, enabling long-distance phone service.   As a LEC, NVC is responsible for a service known as "exchange access," which connects local customers to the IXC necessary to call and receive calls from other LECs.   There are two types of LECs: incumbent LECs (ILECs) and competitive LECs (CLECs). An ILEC is the original LEC that held a monopoly on local exchange services in a community prior to the Telecommunications Act of 1996, Pub. L. 104–104, 110 Stat. 56 (1990).   An ILEC may also be the successor company of the original LEC in an area.   CLECs, such as NVC, are those LECs formed after the Telecommunications Act that compete with an established ILEC in an area.   The Telecommunications Act forms the basis for the existing FCC regulations and orders on all telecommunications carriers.

An ordinary long distance phone call involves three carriers—an originating LEC, an IXC, and a terminating LEC.   The originating LEC has the responsibility for connecting the caller's terminal—the telephone device—to its main local switch through the use of copper or fiber-optic cables.   At its main local switch, the originating LEC aggregates these local cables into common "trunks" that can carry multiple separate calls simultaneously. The originating LEC delivers the call to the circuit of the caller's chosen long-distance provider, the IXC.   This hand-off occurs at a centralized, or tandem, switching location.   The IXC then transmits the call through its circuit system, from tandem trunk to tandem trunk, to the LEC for the recipient's location.   At this terminating LEC, the LEC receives the call at its main local switch, then delivers it through its local network of cables to the recipient's terminal.   In remote areas, the LEC may have a main "host" switch that branches off into additional "remote" end office switches, which are then connected to a caller's terminal.

Consumers generally pay for this service through contracts with IXCs. The IXCs, in turn, pay both the originating and terminating LECs for their services through charges billed by the LECs. Broadly defined, the main components of these charges are either "transport" charges or "terminating switched access" charges. Transport charges are those incurred by a LEC for transporting the IXC's call on its local circuit from where it picks the call up at an interconnection point to the LEC's end office switch, where it can be connected directly to the called party. An IXC might connect directly to a LEC using a direct trunked transport system that only carriers the traffic of one IXC, or it might connect indirectly to the LEC, which allows traffic from multiple IXCs to use the same circuit. Terminating switched access charges, also known as end office charges, are those incurred by a LEC for routing a telephone call to its final called party from the LEC's end office switch.

Because of their distinct histories, ILECs and CLECs are regulated through separate regimes under the FCC to ensure consumers receive reasonable pricing and broad access to telecommunications services. See AT&T Corp. v. All Am. Tel. Co., 28 FCC Rcd. 3477, 3479– 80 (2013) (explaining the regulatory framework for ILECs and CLECs). The FCC requires ILECs to file tariffs to monitor the rates charged by ILECs to IXCs for interstate exchange access services. See 47 U.S.C. § 203. These tariffs set out the telecommunications services offered by an ILEC to an IXC, and the corresponding rates to be charged. See 47 C.F.R. § 61.26. The FCC has the authority to determine the "just and reasonable charge" for a telecommunications service. 47 U.S.C. § 205. In contrast, CLECs like NVC are subject to "minimal rate regulation." All Am. Tel. Co., 28 FCC Rcd. at 3480. CLECs can file tariffs, like ILECs, detailing their charges for interstate exchange access services, but these tariffs are subject to the "benchmark rule;" that is, a CLEC's rates for a specified service can be no higher than the local, competing ILEC's

tariffed rates for that same service. Id.; 47 C.F.R. § 61.26(b). A CLEC can only charge rates higher than the local, competing ILEC if it negotiates and enters into a separate agreement with an IXC to charge higher rates. All Am. Tel. Co., 28 FCC Rcd. at 3480.

Some LECs engage in a practice known as "access stimulation"[2] to increase the volume of calls they handle, thereby increasing their revenue without violating the FCC's benchmark rule by raising their rates. See In re Connect Am. Fund, A Nat'l Broadband Plan for our Future, 26 FCC Rcd. 17663, 17874–90 (2011) [hereafter Connect Am. Fund Order]. Access stimulation occurs when a LEC enters into an agreement with a high-volume telecommunications customer. These customers are identified as free calling parties (FCP) because they often provide "free" services to their users, such as free conference calls, free chat lines, or free international calling. The FCP is assigned a telephone number within the LEC's service area, although the high-volume customer may not have any other connection with the LEC's service area. Id. at 17877. The increase in traffic to the LEC generated from the FCP's users is billed to the IXC, which results in increased revenue for the LEC. Id. In return, the LEC often returns a portion of their increased revenue to the high-volume customer. Id. at 17878–88. The practice of access stimulation has led to increased levels of litigation between LECs and IXCs, and resulted in changes to FCC rules. Id. at 17874–90. In addition to the general tariff and benchmarking requirements for all CLECs, CLECs engaged in access stimulation are prohibited from filing rates for interstate exchange access services that are higher than the "price cap"[3] LEC with the

_____

[2] This practice is also pejoratively called "traffic pumping." The FCC primarily uses the term "access stimulation," which has been previously used by this Court. See Northern Valley Commc'ns, LLC v. AT&T, No. 1:14-CV-01018-RAL, 2015 WL 11675666, at *2 n.3 (D.S.D. Aug. 20, 2015).

[3] The price-cap regulation system is "an incentive-based system of regulation" that caps the rates the nation's largest LECs can charge ratepayers for interstate offerings. See In re Policy and Rules Concerning Rates for Dominant Carriers, 5 FCC Rcd. 6786 (1990).

lowest switched access rates in the state. 47 C.F.R. § 61.26(g); Connect Am. Fund Order, 26 FCC Rcd. at 17886; All Am. Tel. Co., 28 FCC Rcd. at 3480 n.27.

The disputes in this case are controlled broadly by two main sections of the Telecommunications Act of 1996, 47 U.S.C. §§ 201(b) and 203(c). Section 201(b) requires that "[a]ll charges, practice, classifications, and regulations for and in connection with . . . communication service, shall be just and reasonable, and any such charge, practice, classification or regulation that is unjust or unreasonable is hereby declared to be unlawful." 47 U.S.C. § 201(b). Section 203(c) prohibits a carrier from imposing any charges that are not specified in its tariffs. 47 U.S.C. § 203(c) ("[N]o carrier shall . . . charge, demand, collect, or receive a greater or less or different compensation . . . than the charges specified in the schedule then in effect.").

### B. Undisputed Facts

Consistent with Civil Local Rule 56.1, both parties filed statements of undisputed material facts with their respective motions for summary judgment. Docs. 86, 88; see D.S.D. Civ. LR 56.1. Both parties under Local Rule 56.1 filed responses to those statements of undisputed material facts, Docs. 96, 100, and statements of additional material facts, Docs. 95, 101. NVC also filed an additional appendix of facts with its reply brief, which AT&T moves for this Court to strike. Docs. 104-1, 114. Competing motions for summary judgment present a challenge to any court in setting forth pertinent facts. Under Rule 56 of the Federal Rules of Civil Procedure, this Court must view the genuinely disputed facts in the light most favorable to the non-movant, and NVC and AT&T are both movants and non-movants here. This Court has taken care to draw undisputed facts from both NVC's and AT&T's statements of undisputed

material facts, Docs. 86, 88, where they are undisputed by both parties, as indicated by the responsive filings, Docs. 96, 100.

NVC is a CLEC in South Dakota that has been engaging in access stimulation since November 2005. Doc. 88 at ¶ 1; Doc. 100 at ¶ 1. AT&T is an IXC carrier that provides intrastate and interstate long distance telecommunications services throughout the United States including in South Dakota. Doc. 86 at ¶ 1; Doc. 96 at ¶ 1. Because of uncertainty with the rules surrounding access stimulation and charges resulting therefrom, AT&T and NVC have had and settled disputes in the past regarding AT&T's payments to NVC. Doc. 88 at ¶¶ 3, 32; Doc. 100 at ¶¶ 3, 32. These disputes took place prior to the FCC's <u>Connect Am. Fund Order</u>, which in addition to establishing a plan for widespread, affordable fixed and mobile voice and broadband telephone services, also overhauled and provided greater clarity to the access stimulation practice. <u>See</u> 26 FCC Rcd. at 17667, 17676.

As part of the <u>Connect Am. Fund Order</u>'s requirements, NVC filed a new tariff with the FCC that took effect in January of 2012. Doc. 88 at ¶¶ 5–6; Doc. 100 at ¶¶ 5–6. AT&T paid NVC's invoices in full until the March 2013 invoice. Doc. 88 at ¶ 33; Doc. 100 at ¶ 33. NVC contacted AT&T through email requesting payment, and AT&T informed NVC that it was withholding payment "until it can determine the nature of the nearly 200% increase in traffic to your switches since December." Doc. 88 at ¶ 37; Doc. 100 at ¶ 37. Since that invoice, AT&T has been paying NVC for its end office switching charges, but not its transport charges. Doc. 86 at ¶¶ 49–50; Doc. 96 at ¶¶ 49–50; Doc. 100 at ¶ 33. Between April 2013 and November 2014, NVC and AT&T attempted to resolve their disputes. Doc. 86 at ¶ 51; Doc. 88 at ¶¶ 40–65; Doc. 96 at ¶ 51; Doc. 100 at ¶¶ 40–65. No agreement was reached, so NVC filed this suit against AT&T.

As part of its access stimulation business, NVC has separate "Telecommunications Service Agreements" with its high-volume customers, reciting the procurement and provision of "Telecommunications Services" as currently defined by 47 U.S.C. § 153(46). Doc. 88 at ¶¶ 28, 30; Doc. 100 at ¶¶ 28, 30. NVC does business with a number of high-volume customers, and not all provide *free* services to their customers, as suggested by the name "free calling parties" (FCPs). Doc. 86 at ¶ 6; Doc. 96 at ¶ 6. However, in the interest of simplicity for this Court in comparing NVC's business practices with the case law and FCC precedent on the issue, the term "FCP" will be used to reference all high-volume customers of NVC that make up its access stimulation business. These Agreements with FCPs require that NVC provide "at a minimum, DID [direct inward dialing] trunks, DID numbers, [and] connectivity to the Public Switched Telephone Network." Doc. 88 at ¶ 29; Doc. 100 at ¶ 29. NVC also provides corollary services to the FCPs, such as rack space, electrical power, and fire protection for the building. See Doc. 100 at ¶ 29. In return, the FCPs are issued and pay invoices on a routine basis. Doc. 88 at ¶ 31; Doc. 100 at ¶ 31. NVC routes its traffic for access stimulation, along with its relatively small portion of "traditional" telephone calls,[4] from its centralized host switch in Groton to its remote end switches in either Redfield or Aberdeen, depending on where the user directed the call. See Doc. 86 at ¶¶ 31–35; Doc. 88 at ¶¶ 23, 27; Doc. 96 at ¶¶ 31–35; Doc. 100 at ¶¶ 23, 27.

The parties have different characterizations of how the traffic moves between Sioux Falls, where AT&T routes the call to a tandem switch owned by South Dakota Network, LLC (SDN),[5] and NVC's switch in Groton 147 miles away. NVC alleges that its "Point of

---

[4] The bulk of NVC's business presently is with FCPs. See Doc. 86 at ¶ 5; Doc. 96 at ¶ 5. NVC services a primarily rural and somewhat sparsely populated area of South Dakota.

[5] SDN was formed in 1989 as a centralized equal access provider that would provide IXCs access to LECs through one centralized tandem switch in the state, rather than requiring an IXC to separately connect with each LEC. See Alli. Commc'ns Coop., Inc. v. Global Crossing

Interconnection" with SDN is in Sioux Falls, where it either picks up the traffic and transports it along a circuit it claims to be leasing from SDN to Groton, or drops off the traffic transported through Groton along the SDN circuit it claims to be leasing from SDN. Doc. 88 at ¶¶ 20–24. NVC alleges that it has leased SDN's circuit since NVC's inception as a company and that nothing has changed in the physical transportation of the traffic in the last fifteen years, including NVC's monthly lease payments to SDN. Doc. 88 at ¶¶ 20–22. After this dispute over NVC's billings to AT&T arose, AT&T negotiated with SDN to pay SDN directly for the transportation of calls where AT&T is the IXC and NVC is the CLEC between Sioux Falls and Groton. See Doc. 86 at ¶¶ 56–58; Doc. 96 at ¶¶ 56–58. AT&T asserts that, since its agreement with SDN, NVC no longer is carrying the traffic along the circuit between Sioux Falls and Groton and thus cannot bill for that service. Doc. 100 at ¶¶ 20–24. In short, AT&T maintains that because it is paying SDN directly for the transportation between Sioux Falls and Groton, it cannot be required to pay NVC for the same 147 miles of transport. Doc. 100 at ¶¶ 19, 20–24. This dispute regarding the NVC–SDN lease and the AT&T–SDN Agreement is currently the subject of a separate lawsuit in the Fifth Judicial Circuit in Brown County, South Dakota. Doc. 111-2.

### C.  Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." On summary judgment, the evidence is "viewed in the light most favorable to the nonmoving party." True v. Nebraska, 612 F.3d 676, 679 (8th Cir. 2010) (quoting Cordry v. Vanderbilt Mortg. & Fin., Inc., 445 F.3d 1106, 1109 (8th Cir. 2006)). There is a genuine issue of material fact if a "reasonable jury [could] return a verdict for either

---

Telecomms., Inc., 663 F. Supp. 2d 807, 813–14 (D.S.D. 2009) for further description of SDN and its role in the state.

party" on a particular issue.  Mayer v. Countrywide Home Loans, 647 F.3d 789, 791 (8th Cir. 2011).  A party opposing a properly made and supported motion for summary judgment must cite to particular materials in the record supporting the assertion that a fact is generally disputed. Fed. R. Civ. P. 56(c)(1); Gacek v. Owens & Minor Distrib., Inc., 666 F.3d 1142, 1145 (8th Cir. 2012).  "Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment." Thomas v. Corwin, 483 F.3d 516, 527 (8th Cir. 2007).  Summary judgment is not "a disfavored procedural shortcut, but rather . . . an integral part of the Federal rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

"In considering a motion for summary judgment the court does not weigh the evidence, make credibility determinations, or attempt to discern the truth of any factual issue."  Morris v. City of Chillicothe, 512 F.3d 1013, 1018 (8th Cir. 2008).  The standard for summary judgment set out under Rule 56(a) does not change because both parties have moved concurrently for summary judgment.  See Sterneck v. Equitable Life Ins. Co. of Iowa, 237 F.2d 626, 628 (8th Cir. 1956).  "That both sides move for summary judgment does not mean that there are no genuine issues, obliging a court to grant judgment for one side or the other."  Hot Stuff Foods, LLC v. Houston Cas. Co., 771 F.3d 1071, 1076 (8th Cir. 2014) (quoting St. Paul Fire & Marine Ins. Co. v. Engelmann, 639 N.W.2d 192, 199 (S.D. 2002)).  Each party's motion for summary judgment must be evaluated independently in accordance with the standard weight of evidence accorded to the non-moving party to determine if there is any genuine issue of material fact.  See Wermager v. Cormorant Twp. Bd., 716 F.2d 1211, 1214 (8th Cir. 1983); see also St. Luke's Methodist

Hosp. v. Thompson, 182 F. Supp. 2d 765, 769 (N.D. Iowa 2001), aff'd, 315 F.3d 984 (8th Cir. 2003).

## II.    Discussion

The issues framed by the cross-motions for summary judgment are best considered in a specific order. First, the Court must decide, if it can do so based on facts not subject to genuine dispute, whether NVC's billings to AT&T are within the scope of NVC's filed tariffs and are lawful charges.    This requires a consideration of several issues concerning the FCC's requirements for LECs charging IXCs for business from access stimulation under the Connect Am. Fund Order, including whether NVC has properly benchmarked its rates to those charged by the price cap LEC with the lowest rates in South Dakota, whether NVC's services are functionally equivalent to that LEC's services, whether NVC's Tariff is sufficiently clear in defining transport charges, and whether some or all of the FCPs are end users. Next, if NVC's Tariff applies and the charges are lawful, this Court must consider what, if any, effect NVC's dispute resolution clause in its Tariff has on AT&T's claims. This Court also must consider the effect of the pending dispute between NVC and SDN regarding billing of AT&T for the 147-mile stretch between Sioux Falls and Groton in dispute. Only if the charges do not fall under the Tariff must this Court consider whether NVC is entitled to any relief through the state law doctrines of quantum meruit and unjust enrichment.

In briefing, both parties raise the issue of possible referral to the FCC under the primary jurisdiction doctrine, "a common-law doctrine that is utilized to coordinate judicial and administrative decision making."    Access Telecomms. v. Sw. Bell Tel. Co., 137 F.3d 605, 608 (8th Cir. 1998).    There is no "fixed formula" for determining whether a question should be referred to an agency under the primary jurisdiction doctrine.    Id.    The primary jurisdiction

doctrine is applied to obtain agency expertise, Red Lake Bands of Chippewa Indians v. Barlow, 846 F.2d 474, 476 (8th Cir. 1988), and to promote uniformity and consistency, Nader v. Allegheny Airlines, Inc., 426 U.S. 290, 303–04 (1976). "Ordinarily, the construction of a tariff is a matter of law for the Court, being no different than the construction of any other written document." United States v. Great N. Ry. Co., 337 F.2d 243, 246 (8th Cir. 1964). However, where "'words in a tariff are used in a peculiar or technical sense, and where extrinsic evidence is necessary to determine their meaning or proper application,' . . . the issue should first go to the appropriate administrative agency." Access Telecomms., 137 F.3d at 609 (quoting United States v. Western Pac. R.R. Co., 352 U.S. 59, 66 (1956)) (holding that a complicated question involving voice grades, circuits, and length of a local loop connection fell within the FCC's primary jurisdiction). The expense and delays that often result from referrals to agencies make the Eighth Circuit "reluctant" to invoke the doctrine. Id. at 608; United States v. McDonnell Douglas Corp., 751 F.2d 220, 224 (8th Cir. 1984). Although some of the questions involved in this lawsuit are complex, none necessitate referral to the FCC. In the interests of reducing costs and avoiding delay awaiting an FCC ruling for two companies whose dispute has lingered too long, this Court can provide a straightforward construction of NVC's Tariff in light of existing case law, regulations, and FCC orders.

### A. Issues Concerning Tariff Applicability

NVC argues that it is allowed to collect from AT&T under NVC's Tariff filed with the FCC. In a series of orders and rulings, the FCC has determined that charges levied by telecommunications companies must conform to a set of requirements. Telecommunications companies seek to meet these requirements through written tariffs filed with the FCC. Filed tariffs not only allow telecommunications customers to know exactly for what services and in

what amounts they will be billed, but also ensure that similar customers will be charged similarly for services. NVC's Tariff declares that a "Buyer is responsible for the payment of charges for any service it takes from [NVC]," and a "buyer" is defined as "an Interexchange Carrier utilizing [NVC's] Access Service to complete a Call to or from End Users." Doc. 87 at 15. To recover under Count I of its Complaint based on tariffed charges, NVC argues it need only prove: "a) AT&T is an Interexchange Carrier that is b) utilizing NVC's Access Service c) to complete a call to or from End Users." Doc. 87 at 17–18. NVC submits that AT&T is an IXC, AT&T is utilizing NVC's access services, NVC's local customers and FCPs are End Users under the definition in the Tariff, and therefore NVC is entitled to collect on its invoices issued to AT&T at the rates set forth in NVC's Tariff. Doc. 87 at 18–20.

AT&T counters that the invoices filed by NVC fall outside the Tariff because NVC's Tariff does not meet the FCC's requirements from the Connect Am. Fund Order, which requires the benchmarking of rates for functional equivalent service in order to collect for FCP business, the Tariff's definition of transport charges is deficient, the FCPs are not "end users," and NVC cannot bill AT&T for transport between Sioux Falls and Groton because AT&T pays SDN separately for that transport. See Doc. 85 at 20. AT&T also argues that it is entitled to a refund for any end office switching charges paid, because they did not conform to the federal or state tariff's requirements. Doc. 85 at 37. NVC disputes AT&T's claims and asserts that it is entitled to summary judgment regardless because AT&T did not comply with NVC's dispute resolution clause to raise these issues. See Doc. 87 at 38–47.

NVC oversimplifies what it must show in order to collect from AT&T under NVC's Tariff. The FCC has outlined specific requirements applicable to LECs billing IXCs for business

attributable to access stimulation and FCPs.  The cross-motions for summary judgment frame a

series of issues addressed separately below.

> ### 1.        Benchmarking and Functional Equivalency

In 2011, the FCC discussed its rules and orders applicable to access stimulation

companies.

> Resolution of the present dispute [between an IXC and a CLEC] requires an
> examination first of the Commission's rules and orders governing incumbent local
> exchange carrier ("ILEC") access services. ILECs are required to publish the rates,
> terms, and conditions applicable to their access service in tariffs filed with the
> Commission. The Commission's rules governing these tariffs provide that ILECs may
> recover access service costs through charges assessed on both IXCs and "end
> users." These rules have, since their promulgation in 1983 in anticipation of the
> AT&T divestiture, defined "end user" as "any customer of an interstate or foreign
> telecommunications service that is not a carrier." The Commission, since 1984, also
> has *required* that ILEC access tariffs define "end user" as "any customer of an
> interstate or foreign telecommunications service that is not a carrier."
>        In contrast to ILECs, CLECs may impose interstate access charges either
> through tariffs or contracts negotiated with IXCs. In the *CLEC Access Charge Reform
> Order* [16 FCC Rcd. 9923 (2001)], the Commission found that CLEC access rates
> were, on average, "well above the rates that ILECs charge for similar service" and
> acknowledged that some CLECs were "refus[ing] to enter meaningful negotiation on
> access rates, choosing instead simply to file a tariff and bind IXCs . . . to the rates
> therein." The Commission declared further that its goal was "ultimately to eliminate
> regulatory arbitrage opportunities that previously have existed with respect to tariffed
> CLEC switched access services." Accordingly, the Commission prohibited CLECs
> from tariffing switched access rates that were higher than the switched access rates of
> the ILEC serving the same geographic area in which the CLEC was located. In other
> words, CLEC switched access rates would be "benchmarked" against ILEC rates. If a
> CLEC wished to impose higher switched access rates, it could do so only by
> negotiating with the affected IXCs. Finally, . . . in the *CLEC Access Charge Reform
> Reconsideration Order*, the Commission clarified that a CLEC may assess tariffed
> switched access charges at the appropriate benchmark rate only for calls to or from
> the CLEC's own end users.

Qwest Commc'ns Co., LLC v. N. Valley Commc'ns, LLC, 26 FCC Rcd. 8332, 8334–35 (2011)

(hereinafter Northern Valley I) (footnotes omitted).  Thus, NVC has two avenues under Northern

Valley I to collect from AT&T: 1) negotiate a rate with AT&T, which NVC and AT&T have

been unable or unwilling to accomplish; or 2) charge AT&T a rate "benchmarked" to an ILEC's

rate, which is what NVC aimed to do through its filed tariff. See Connect Am. Fund Order, 26 FCC Rcd. at 17886. The first question then is whether NVC's Tariff is valid and benchmarked to a proper rate.

47 U.S.C. § 201(b) requires that rates for telecommunications services be "just and reasonable." In evaluating this requirement, courts draw distinctions between tariffs that are "legal" and tariffs that are "lawful." See Virgin Islands Tel. Corp. v. FCC, 444 F.3d 666, 668–69 (D.C. Cir. 2006). A tariff that is "legal" is one that is procedurally valid, meaning it has been properly filed with the FCC and it has taken effect; a lawful tariff is one that is legal and contains rates determined to be "just and reasonable." Id. at 669. A tariff can become lawful if the FCC reviews its rates in a hearing, or through the streamlined process in 47 U.S.C. § 204(a)(3) where the tariff is "deemed lawful." See In re Implementation of Section 402(b)(1)(A) of the Telecomms. Act of 1996, 12 FCC Rcd. 2170, 2182–83 (1997). Even if a "deemed lawful" tariff is later found to include rates that are not "just and reasonable," the carrier is not liable for any prior overcharges. Virgin Islands Tel. Corp., 444 F.3d at 669; ACS of Anchorage, Inc. v. FCC, 290 F.3d 403, 410–12 (D.C. Cir. 2002) (explaining that a "deemed lawful" tariff's terms are "conclusively presumed to be reasonable").

Under 47 U.S.C. § 204(a)(3), a LEC's tariff that includes a "new or revised charge, classification, regulation, or practice," is deemed lawful 15 days after its filing with the FCC, so long as the FCC does not take some action, either on its own or after a complaint, to hold a hearing on the lawfulness of the tariff before the end of the 15-day period. The Connect Am. Fund Order required that CLECs engaged in access stimulation file a revised tariff with the FCC within 45 days that reduced their rates for access services to that of the price cap LEC with the lowest rates in the state. See Connect Am. Fund Order, 26 FCC Rcd. at 17886; 47 C.F.R.

§ 61.26(g).  The <u>Connect America Fund Order</u> was released on November 18, 2011, and NVC filed a new tariff on January 6, 2012, within the 45-day period.  Doc. 88 at ¶ 5; Doc. 100 at ¶ 5. This new tariff sought to benchmark NVC's rates to CenturyLink's, the price cap LEC with the lowest rates in the state, although AT&T disagrees that NVC succeeded in so benchmarking its rates.  <u>See</u> Doc. 88 at ¶ 8; Doc. 100 at ¶ 8; Doc. 86 at ¶ 152; Doc. 96 at ¶ 152.  By its terms, this tariff did not take effect for 15 days, and within those 15 days there was no action on NVC's Tariff and no objection to the Tariff from AT&T.  <u>See</u> Doc. 88 at ¶¶ 6–8; Doc. 100 at ¶¶ 6–8. NVC's Tariff filed on January 6, 2012 thus is both legal and "deemed lawful" under 47 U.S.C. § 204(a)(3).  Notwithstanding AT&T's arguments to the contrary, NVC's Tariff is deemed lawful.  <u>See</u> <u>Great Lakes Commc'ns Corp. v. AT&T Corp.</u>, No. 13-CV-4117-DEO, 2015 WL 12551192, at *12 (N.D. Iowa June 8, 2015) (finding a tariff filed contemplating access stimulation charges deemed lawful under similar circumstances).

NVC's Tariff being deemed lawful does not necessarily mean that the Tariff complies with the FCC's requirements and does not foreclose AT&T's arguments that the Tariff is actually not lawful. <u>See, e.g.,</u> <u>Global NAPS, Inc. v. FCC</u>, 247 F.3d 252, 259–60 (D.C. Cir. 2001); <u>Iowa Network Servs., Inc. v. Qwest Corp.</u>, 466 F.3d 1091, 1097 (8th Cir. 2006); <u>PAETEC Commc'ns, Inc. v. CommPartners, LLC</u>, No. 08-0397 (JR), 2010 WL 1767193, at *4–5 (D.D.C. Feb. 18, 2010).  AT&T indeed makes several arguments about why NVC's transport charges invoiced to AT&T are unlawful and outside the Tariff filed with the FCC.

AT&T argues that NVC has failed to comply with the FCC's rules on benchmarking its rates to those of CenturyLink, the applicable ILEC under the <u>Connect Am. Fund Order</u>, because NVC is not providing the "functional equivalent" of service that AT&T could receive from CenturyLink.  AT&T argues that in order to provide the "functional equivalent" service that

16

CenturyLink does, NVC is required to provide a "direct trunked transport"[6] connection to carry AT&T's traffic between Sioux Falls and Redfield or Aberdeen. Such a direct trunk would service only AT&T traffic, rather than every IXC that needed to connect to NVC's network. With a direct trunk, AT&T's traffic would not be subject to the per mile rate that common and tandem switched transport is, thereby significantly lowering NVC's bill to AT&T each month. AT&T also argues that at minimum, NVC is required to allow AT&T to install at NVC such a direct connection.

The FCC's regulations requiring benchmarking between CLEC rates and ILEC rates do not support AT&T's assertions. 47 C.F.R. § 61.26. "The benchmark rate for a CLEC's switched exchange access services will be the rate charged for similar services by the competing ILEC." Id. § 61.26(c). Switched access services, in turn, are defined as "includ[ing] . . . [t]he functional equivalent of the ILEC interstate exchange access services."   Id. § 61.26(a)(3).   The rate elements that are "typically associated" with "ILEC interstate exchange access services" include "Carrier common line (originating); carrier common line (terminating); local end office switching; interconnection charge; information surcharge; tandem switched transport termination (fixed); tandem switched transport facility (per mile); tandem switching." Id. § 61.26(a)(3)(i). The FCC has clarified that while a CLEC cannot charge the full benchmark rate whenever any portion of switched exchange access services are provided, a CLEC does not have to provide *every* service in its definition of switched exchange access services in order to receive the ILEC's benchmark rate for switched exchange access services. In re Access Charge Reform, 19 FCC Rcd. 9108, 9114–15 n.48 (2004) (hereinafter Eighth Report and Order).   The FCC

---

[6] CenturyLink's tariff filed with the FCC includes the option to provide this direct trunked transport connection to an IXC. See Doc. 81-17 at 4, 11. CenturyLink is a much larger business than NVC that utilizes and has tariffed charges for both direct and indirect connection of calls. See Doc. 81-17 at 9.

explained that the definition found in 47 C.F.R. § 61.26(a)(3) is "intended to illustrate what might be considered the 'functional equivalent' of incumbent LEC access services, rather than mandating the provision of a particular set of services." Eighth Report and Order, 19 FCC Rcd. at 9114 n.48. Indirect connection of calls without a direct trunk specifically for AT&T is the functional equivalent of CenturyLink's service in South Dakota under its tariff. See id. at 9114–15.

Indeed, the Telecommunications Act of 1996 supports the notion that carriers like NVC retain the option to provide direct or indirect service. "Each telecommunications carrier has the duty . . . to interconnect directly *or* indirectly with the facilities and equipment of other telecommunications carriers." 47 U.S.C. § 251(a) (emphasis added). Consistent with the statute, the FCC in 1996 stated that "competitive telecommunications carriers [CLECs] that have the obligation to interconnect with requesting carriers may choose, based upon their own characteristics, whether to allow direct or indirect interconnection." In re Implementation of the Local Competition Provisions in the Telecomms. Act of 1996, 11 FCC Rcd. 15499, 16171 (1996). The FCC explained that while ILECs were required to connect directly upon request under 47 U.S.C. § 251(c), CLECs did not have this requirement. Id. at 15991. Instead, as the Ninth Circuit recently recognized, "CLECs, by contrast, are not subject to § 251(c); CLECs are governed by §§ 251(a) and (b), which do not *require* them to interconnect directly if direct interconnection would be uneconomical or technically infeasible for them." N. Cty. Commc'ns Corp. v. Qwest Corp., 824 F.3d 830, 841 (9th Cir. 2016) (finding that while § 251(a) permits indirect interconnection, a CLEC cannot demand an indirect interconnection of another LEC, where a separate interconnection agreement has been negotiated requiring direct interconnection). In 2006, although dealing with the duty to connect between an ILEC and a

LEC in establishing local dialing parity, the Eighth Circuit stated that because Congress did not include any consequences "attendant to choosing an indirect rather than a direct connection" under 47 U.S.C. § 251(a)(1), the text of the Act did not support distinctions between the two connection options. WWC License, LLC v. Boyle, 459 F.3d 880, 892–93 (8th Cir. 2006).

The legal issue here—whether a CLEC engaged in access stimulation has to provide a direct trunk transport system to an IXC in order to provide services functionally equivalent to those provided by an ILEC to receive the benchmark rate—appears to be rather novel, apparently addressed somewhat fleetingly in only one other case.  See Great Lakes Commc'ns Corp. v. AT&T Corp., No. C13-4117-MWB, 2015 WL 3948764, at *5 (N.D. Iowa June 29, 2015) (dismissing issue without referral to FCC).  For its argument, AT&T relies on the 2008 FCC decision of In re Access Charge Reform, 23 FCC Rcd. 2556 (2008), which decision is known as and will be referred to as PrairieWave.  In PrairieWave, the FCC considered in part a petition by Cox Communications for clarification of a prior FCC order that determined an ILEC's switching rate should be benchmarked as a CLEC's end office rate and a CLEC's tandem switching rate, depending on the services provided; Cox Communications argued that a CLEC should be able to charge the benchmarked switching rate for both services when it performs both functions.  Id. at 2563.  AT&T opposed this clarification, arguing that it would "create incentives for [C]LECs to route calls through several switches before delivering them to end users in order to charge for both tandem and end office switching," and could "lead to IXCs being billed by multiple [C]LECs and [I]LECs, each claiming to have provided tandem switching to complete a call." Id. at 2564.  The FCC agreed with Cox Communications, and determined that when a CLEC performs both end office and tandem switching, using two separate switches, it could charge for

both functions. Id. at 2565. The FCC addressed AT&T's concerns about incentives for CLECs to deliberately overcharge by stating:

> Our decision here is premised on the assumption that a [C]LEC will permit an IXC to install direct trunking from the IXC's point of presence to the [C]LEC's end office, thereby bypassing any tandem function. So long as an IXC may elect to direct trunk to the [C]LEC's end offices, and thereby avoid the tandem switching function and associated charges, there should be limited incentive for [C]LECs to route calls unnecessarily through multiple switches, as suggested by AT&T.

Id. In the footnote accompanying this statement, the FCC quoted from Cox Communications' briefing, that "IXCs always retain the right to provide direct trunking to competitive LEC end offices." Id. at n.94. The FCC in PrairieWave was not dealing with an issue of functional equivalency, however.

At oral argument on the cross-motions for summary judgment, AT&T referenced this portion of PrairieWave, first saying that at the very least, it would like to be able to establish a direct trunk connection with NVC, but without any "unreasonable conditions like fees"; and second asserting that NVC should be required to provide the direct trunk option to be functionally equivalent to CenturyLink's services, and in turn to be benchmarked to its charges. See Doc. 119 at 10:44 a.m. Although not the holding of PrairieWave, its guidance does suggest that when offered, a CLEC ought to agree to a direct trunk connection by an IXC at the IXC's expense. Prairiewave, 23 FCC Rcd. at 2565 & n.94. The record is unclear whether AT&T offered to install a direct trunk at its own expense at NVC, or instead negotiated for or demanded that NVC do so or pay for any costs of doing so. See Doc. 93 at 8–9.

Nothing in PrairieWave mandates that a CLEC install and provide direct trunking to an IXC upon demand of an IXC at the CLEC's cost, or that failure to do so means that benchmark and functional equivalency standards are unmet. As long as NVC has not spurned an

unconditional offer from AT&T to install a direct trunk at NVC at AT&T's cost, NVC is entitled to charge a properly benchmarked rate for an indirect connection for telecommunications services NVC provides to end users under its "deemed lawful" tariff. A CLEC like NVC cannot be forced to provide at its own expense a direct trunk connection merely because an IXC asks for one. The FCC did not include the requirement that a CLEC provide the option of a direct trunk connection when it offered examples of the functional equivalent services to be offered in 47 C.F.R. § 61.26(a)(3)(i), including instead "tandem switched transport," an indirect connection. In short, NVC does not have to *provide* AT&T with a direct trunk connection, but it may be required to *accept* a direct trunk connect, contingent on AT&T designing, installing, and implementing it at AT&T's cost without conditions. See PrairieWave, 23 FCC Rcd. at 2565 & n.94. Short of that, which apparently did not occur here, the provision of a direct trunk connection was not a requirement for NVC to bill AT&T for transport rates according to its benchmarked tariffed rates if otherwise lawful. So the Court now turns to AT&T's other arguments about whether NVC's Tariff and charges under the Tariff are lawful.

### 2.   Definition of Transport Charges

AT&T next argues that NVC's Tariff improperly defined and described services for which NVC billed AT&T. 47 U.S.C. § 203(c) requires telecommunications carriers to file tariffs and prohibits carriers from charging for communications or services that are not described within the tariffs. The FCC regulations require that "all tariff publications must contain clear and explicit explanatory statements regarding the rates and regulations." 47 C.F.R. § 61.2(a). The FCC has clarified that access stimulation tariffs must comply with this standard. See Eighth Report and Order, 19 FCC Rcd. at 9117 ("[A]ccess tariffs, like all other tariffs, must clearly identify each of the services offered and the associated rates, terms, and conditions."). If a

carrier attempts to charge for a service not included within its tariff, the filed rate doctrine would bar its collection. "The filed rate doctrine prohibits a regulated entity from charging any rate other than that filed with the relevant regulatory authority. . . ." Firstcom, Inc. v. Qwest Corp., 555 F.3d 669, 681 (8th Cir. 2009); MCI WorldCom Network Servs. Inc. v. PaeTec Commc'ns, Inc., 204 F. App'x. 271, 272 n.2 (4th Cir. 2006) (per curiam) ("Under the filed rate doctrine, a carrier is expressly prohibited from collecting charges for services that are not described in its tariff.").

For purposes of determining whether a filed tariff has "clear and explicit explanatory statements" under 47 C.F.R. § 61.2(a), the FCC has explained that tariff terms should be construed as having their "common meaning in the industry." AT&T Corp. v. YMax Commc'ns Corp., 26 FCC Rcd. 5742, 5753, 5756 (2011). As the Eighth Circuit put it, "a tariff['s] . . . terms must be taken in the sense in which they are generally used and accepted; and it must be construed in accordance with the meaning of the words used." Penn Cent. Co. v. Gen. Mills, Inc., 439 F.2d 1338, 1340–41 (8th Cir. 1971); see also United States v. U.S. Steel Corp., 645 F.2d 1285, 1290 (8th Cir. 1981) ("[A] court should first determine a permissible construction which conforms with the intentions of the framers of [the] tariff."). If found, "any ambiguity in a tariff is construed against the party who filed the tariff," because a tariff is not a two-party contract, but instead is unilaterally drafted by the filing company. YMax Commc'ns., 26 FCC Rcd. at 5754–55.

AT&T argues that because NVC's Tariff does not include a proper description and filed rate for "transport," AT&T cannot be required to pay for the transport services provided by NVC. Doc. 85 at 24; see also Verizon Delaware, Inc. v. Covad Commc'ns Co., 377 F.3d 1081, 1087 (9th Cir. 2004) ("[A]ll of the published cases addressing the filed rate doctrine hold

unequivocally that no one may bring a judicial proceeding to enforce any rate other than the rate established by the filed tariff." (internal quotation removed)).  AT&T argues that while NVC has a filed rate for 1) "Tandem Switched Transport – Per Mile, per MOU/mile" and 2) "Tandem Switched Transport – Fixed, per MOU," the only related descriptions state that "Transport rate categories consist of two elements: [1] a Transport Termination per path per MOU charge . . . and [2] a Transport Facility rate per mile per MOU charge."  Doc. 85 at 26 (alteration in original).  Because no specific rates are given for 'Transport Termination' or 'Transport Facility,' AT&T argues that NVC cannot charge for any transport services. Doc. 85 at 26.  NVC responds that its Tariff adequately "describes the purpose of transport . . . , identifies the two elements of the transport service that Northern Valley provides, lists the rates for those two elements of transport service, and explains how to determine the mileage that will be assessed for transport service. Accordingly, the Tariff appropriately describes and provides rates for the services that have been billed to AT&T and does so using terminology that the FCC acknowledges is industry-standard nomenclature." Doc. 93 at 15.

The NVC Tariff's rate page first states that the "rates mirror those filed by . . . CenturyLink." Doc. 1-1 at 57; Doc. 1-2 at 10.  There is little doubt that NVC sought to benchmark its transport rates to those of CenturyLink, the price cap LEC in South Dakota with the lowest such rate, in an effort to comply with the <u>Connect Am. Fund Order</u>. NVC's Tariff then includes a table of rates that is a breakdown of NVC's access service. The table is listed under "Switched Access Service," and contains six items, including

| | |
|---|---|
| Tandem-Switched Transport – Per mile, per MOU/mile | $0.000030 |
| Tandem Switched Transport – Fixed, per MOU | $0.000240 |

Doc. 1-1 at 57; Doc. 1-2 at 10.  AT&T is correct that the definitions pages do not explicitly describe these two items.  However, when read as a whole, the Tariff adequately defines these

rate elements as required by the FCC.  First, the definitions section defines "Access or Access Service" to include "the functional equivalent of the incumbent local exchange carrier interstate exchange access services," including "tandem switched Transport Termination (fixed)" and "tandem switched Transport Facility (per mile)."  Doc. 1-1 at 9.  Next, the Tariff defines "Switched Access Service," which the disputed rates are listed under, as "[a]ccess to the Network of [NVC] for the purpose of receiving or delivering Calls."  Doc. 1-1 at 11.  The Tariff defines both "Tandem Switching" and "Transport," the two major elements of the disputed rates. "Tandem Switching" is defined as "an intermediate switching function between the originating point of a Call and its final destination. This function can be provided by a tandem switch or functionally equivalent equipment."  Doc. 1-1 at 48.  "Transport" is defined as "[c]harges for the transmission of Calls. Transport rate categories consist of two elements: a Transport Termination per path per MOU charge . . . and a Transport Facility rate per mile per MOU charge."  Doc. 1-1 at 48.  Therefore, the Tariff includes appropriate definitions for its transport rates. Contra Great Lakes Commc'ns Corp., 2015 WL 12551192, at *17–21 (adopting AT&T's argument that transport charges were not properly defined in an arguably similar tariff).

Any arguably inadequate definition of the two specific rates is clarified by the repeated statements that "[t]hese rates mirror those filed by Qwest Corporation d/b/a/ CenturyLink QC on file with the Commission," under the heading "Rates Reflect Tariffed Rates of Appropriate ILECs."  Doc. 1-1 at 57; Doc. 1-2 at 10.  Such statements gave even further notice to AT&T of what it is being charged for switched access services. CenturyLink's tariff does offer a more detailed definition for "Switched Transport," where "Tandem Transmission is composed of a fixed per-MOU rate and per-mile/per MOU rate.  The fixed rate provides for the circuit equipment at the end of the interoffice transmission paths. The per-mile rate provides for the

transmission facilities, including intermediate transmission circuit equipment between the end points of the interoffice circuit." Doc. 81-17 at 10. The mere fact that the NVC Tariff fails to contain this definition does not thereby render the NVC Tariff deficient. CenturyLink's rate table for "Tandem-Switched Transport" includes "Tandem Transmission Usage Rates" of $0.000030 for per mile rate per access minute, and $0.000240 for fixed rate per access minute, which are the same rates NVC's Tariff lists. Doc. 81-17 at 14. Therefore, NVC has properly described the rates charged in its Tariff as a matter of law. Because the issue of transport billing between Sioux Falls and Groton is impacted by pending state litigation and not ripe for this Court's decision, AT&T's remaining arguments regarding NVC billing for that portion of transport service need not be addressed at this time.

AT&T next argues that NVC's Tariff does not allow billing for transport between Groton and Redfield, or between Groton and Aberdeen. Doc. 85 at 29. AT&T argues first that because Groton is an end office switch, NVC's transport charges beyond Groton are impermissible as "loop" charges from an end office switch to a user, and second that NVC's exception to these loop charges, a "host-remote network," is improperly defined within NVC's tariff. See Doc. 85 at 29–30; Doc. 86 at ¶¶ 34–35; Doc. 96 at ¶¶ 34–35. A host-remote network configuration allows for transport billing between two LEC facilities, one switch that operates as a "host," and another switch, closer to the call's termination, that operates as a "remote." See In re Transport Rate Structure and Pricing, 8 FCC Rcd. 5370, 5372 (1993). AT&T argues that because NVC's Tariff does not include a billing segment specifically for host-remote network configurations, NVC cannot bill for the transport provided between Groton and Redfield or Groton and Aberdeen. Doc. 85 at 30. AT&T further argues that NVC cannot bill for transport charges between Groton and Redfield or Aberdeen because it was not set up in a host-remote

configuration. Doc. 85 at 29. NVC responds that it does not need to include a separate billing description for a host-remote situation because it is still providing a transport service, identified as appropriate Points of Presence in the Local Exchange Routing Guide (LERG). Doc. 93 at 18–19. NVC's Tariff states that "[w]here charges for an access service are based on distance, the distance between two points is measured as airline distance between the Company's Points of Presence as listed in the National Exchange Carrier Association FCC No. 4, Wire Center Tariff or Local Exchange Routing Guide (LERG)." Doc. 1-1 at 45. According to NVC, NVC's switch in Groton is labeled as a "host" in the LERG, while Aberdeen and Redfield are listed as "remotes." See Doc. 96 at ¶¶ 34–35, 146. Although AT&T seeks to contest this, even an AT&T official in deposition testimony referred to NVC's Redfield switch as a "remote." Doc. 103-4 at 6–11; see also Doc. 81-11 at 6. In neither its memorandum accompanying its Motion for Summary Judgment, Doc. 85, or its Reply, Doc. 109, has AT&T provided case law[7] or FCC rules or orders that require a tariff to include a separate billing structure or description specifically for host-remote configurations, only the general requirements, as explained above, that a tariff must "clearly identify each of the services offered and the associated rates, terms, and conditions." Eighth Report and Order, 19 FCC Rcd. at 9117. There is no authority that requires a host-remote network configuration to be separately defined and rated from any other transport. NVC's Tariff as a matter of law has a clear and explicit explanatory statement of the rates and regulations.

---

[7] AT&T cites only In re Transport Rate Structure and Pricing, 8 FCC Rcd. at 5372 in its argument, and then only for the definition of what a host-remote network configuration is. In re Transport Rate Structure and Pricing predates the Telecommunications Act of 1996, and does not address this issue.

### 3.  FCPs as End Users

Next, AT&T argues that it need not pay certain NVC billings and indeed is entitled to a refund of most of the end office switching charges, because many of NVC's FCPs are not "end users" as defined and contemplated by NVC's Tariff.  Doc. 85 at 37.  Specifically, AT&T believes itself entitled to refunds as a matter of law for the end office switching charges paid for calls involving four FCPs, does not move for summary judgment on refunds from three other FCPs, and argues an eighth FCP does not meet the end user requirements, but submits that NVC's relationship with this final FCP presents factual issues more appropriate for trial.  See Doc. 85 at 37 & n.43.  In NVC's Tariff, End User is defined as "any Customer of an Interstate or Foreign Telecommunications Service that is not a carrier. . . . An End User must pay a fee to the company for the telecommunications service."  Doc. 1-1 at 10.  AT&T argues that four of NVC's FCPs are not end users as a matter of law because they do not "pay a fee" to NVC for telecommunications services.  Doc. 85 at 37.  Thus, AT&T argues, "NVC is prohibited from assessing any access charges via tariff on calls attributable to the Four FCPs, and NVC is liable to return all end office switching charges that AT&T has paid on this traffic."  Doc. 85 at 42.  NVC disputes this and asserts that the FCC does not regulate the rates CLECs charge their own end users, so the question of whether the end users properly pay a telecommunications fee to NVC is irrelevant.  See Doc. 87 at 19 n.6; Doc. 93 at 30–32.

Although not directly regulating the FCP–LEC relationship, the FCC repeatedly has required FCPs to pay a fee to LECs engaged in access stimulation or risk violating sections 201(b) and 203(c) of the Telecommunications Act of 1996.  In Farmers I, the FCC determined that an FCP could be an "end user" under a LEC tariff as long as it paid a fee to the LEC for its services, even if the LEC paid the FCP, in return, more in marketing fees than it received in

telecommunications service fees. Qwest Commc'ns Corp. v. Farmers & Merchs. Mut. Tel. Co., 22 FCC Rcd. 17973, 17987–88 (2007) (hereinafter Farmers I). Additional evidence presented with a motion for reconsideration revealed that the LEC in Farmers I had backdated many of its invoices, and that the FCPs were not paying telecommunications fees until after the litigation had commenced. Qwest Commc'ns Corp. v. Farmers & Merchs. Mut. Tel. Co., 24 F.C.C. Rcd. 14801, 14803–04 (2009) (hereinafter Farmers II). Thus, in Farmers II the FCC looked again at when FCPs involved in access stimulation tariffs were end users under a tariff. The FCC in Farmers II considered a number of factors and declared that "the flow of money between [CLECs and FCPs] is essential to analyzing their relationship."[8] Id. at 14806 n.49. The FCC ultimately held in Farmers II that an IXC was not required to pay a LEC for calls delivered to an FCP if the FCP did not pay a fee for telecommunications services to the LEC. Id. at 14812–13.

NVC itself has been involved in a case defining what an end user is under a tariff. In Northern Valley I, NVC attempted to sidestep the FCC's decision in Farmers II by including a provision in its tariff that a customer did not have to purchase any services provided by NVC to be classified as an end user. Northern Valley I, 26 FCC Rcd. at 8337. The FCC agreed with the IXC that it did not have to pay NVC's invoices for switched exchange access services because "the Tariff's revised 'end user' definition allows Northern Valley to violate the Commission's

---

[8] The other factors considered by the FCC were the contemplation of payment for service from the FCPs to the LEC; whether the LEC treated the FCPs as it did its other customers; whether the LEC's contracts with the FCPs contained an exclusivity clause; whether the FCPs' traffic was handled differently than the LEC's other customers; whether the agreements between the FCPs and the LEC resembled traditional agreements for tariffed service; and whether there was a timely reporting of the services by the LEC to the FCC. Farmers II, 24 FCC Rcd. at 14806–13. In one of its more recent decisions, the FCC applied the multi-factor analysis from Farmers II to analyze whether a LEC appropriately treated its FCPs as it would other end users in its tariff, emphasizing that whether a fee for telecommunications services was genuinely paid remained the most important factor. See Qwest Commc'ns Co., LLC, v. Sancom, Inc., 28 FCC Rcd. 1982, 1990–93 (2013) (hereinafter Sancom).

CLEC access rules and orders by imposing tariffed switched access charges for terminating calls to entities to whom Northern Valley offers free service.  Accordingly, we conclude that the Tariff violates section 201(b) of the [Telecommunications] Act, and must be revised." Northern Valley I, 26 FCC Rcd. at 8341.  In Northern Valley II, the FCC denied NVC's motion for reconsideration and addressed NVC's claim made in this case, that the FCC and in turn Northern Valley I did not regulate the CLEC–End User relationship.  Qwest Commc'ns Co. v. Northern Valley Commc'ns, LLC, 26 FCC Rcd. 14520, 14526 (2011).  The FCC explained that if a LEC "chooses to assess access charges upon IXCs by *tariff*, the individuals or entities to whom Northern Valley provides access must be 'end users' (*i.e.*, paying customers)." Id. at 14525.  On appeal, the D.C. Circuit affirmed the FCC's order that the end user fee requirement regulates the relationship between the CLEC and the IXC, not the CLEC and the end user.  Northern Valley Commc'ns, LLC v. FCC, 717 F.3d 1017, 1019 (D.C. Cir. 2013) ("[W]e uphold the FCC's decision that CLECs may not rely on tariffs to charge long-distance carriers for access to CLECs' non-paying customers.").  The FCC also has struck down other access stimulation business models as unjust or unreasonable under 47 U.S.C. § 201(b) without reliance on a violation of a particular FCC regulation or order.  See All Am. Tel. Co., 28 FCC Rcd. at 3490 n.127, 3492 (finding § 201(b) violations where the ILECs engaged in sham arrangements to inflate access charges by creating CLECs for the sole purpose of providing services to FCPs to bill higher rates to IXCs); YMax Commc'ns Corp., 26 FCC Rcd. at 5744 (finding § 201(b) violations where CLEC was created solely for the use of the MagicJack VOIP calling system, a system that provides consumers with free long distance calling over the internet after a one-time purchase); Total Telecomms. Servs., Inc. v. AT&T Corp., 16 FCC Rcd. 5726, 5733–34 (2001)

(finding § 201(b) violations where an ILEC created a CLEC for the sole purpose of billing higher rates for access services to the IXC).

As part of its access stimulation business, NVC has two agreements with each of the FCPs it services. Doc. 86 at ¶ 75; Doc. 96 at ¶ 75. For the four FCPs AT&T argues not to be end users as a matter of law, NVC and the FCP entered into: 1) a "Telecommunications Service Agreement," where the FCP agrees to pay a monthly charge for telecommunications services based on the terms of the agreements and "Peak Monthly Voice Port Usage"; and 2) a "Marketing Agreement," where NVC pays the FCP two types of fees—a fixed marketing fee and a variable marketing fee that changes depending upon the number of minutes generated. Doc. 86 at ¶¶ 97–115; Doc. 96 at ¶¶ 97–115. For these four FCPs, the fixed marketing fee in the Marketing Agreement is currently higher than the telecommunications fee in the Telecommunications Service Agreement. Doc. 86 at ¶ 116; Doc. 96 at ¶ 116. AT&T argues that this serves effectively as a "refund" of the telecommunications fee, so that the FCPs are no longer end users under the Tariff because they are not paying customers. Doc. 85 at 42.

NVC first responds that FCPs receiving a net payment from a CLEC is the business model for access stimulation and does not take the FCPs out of end user status. Doc. 93 at 31. FCC regulations support NVC's argument to an extent; 47 C.F.R. § 61.3(bbb)(1)(i) describes access stimulation as occurring where a carrier "[h]as an access revenue sharing agreement, whether express implied, written or oral, that, over the course of the agreement, would directly or indirectly result in a net payment to the other party." The FCC recognizes that such a net payment originates from an "access revenue sharing agreement" that involves "the billing or collection of access charges from interexchange carriers [IXCs]." 47 C.F.R. § 61.3(bbb)(1)(i). Yet the case law and FCC orders discussed above require end users to pay a valid fee for

telecommunications services before the CLEC can collect access charges from IXCs on FCP generated business.

AT&T argues that the telecommunications fees paid to NVC by the four FCPs are "illusory" in nature because the fixed marketing fee eliminates the risk that these four FCPs will pay out more than they receive each month in the contemplated net payment access stimulation relationship. Doc. 85 at 42 n.47. The Farmers II factors[9] determine whether these four FCPs are in fact end users. Farmers II, 24 FCC Rcd. at 14806–13; Sancom, 28 FCC Rcd. at 1990–93. First, the four FCPs are charged and owe a monthly telecommunications charge and a fee for peak monthly voice port usage. Doc. 86 at ¶¶ 97–115; Doc. 96 at ¶¶ 97–115. Second, those charges are similar to what other customers owe.[10] See Doc. 86 at ¶¶ 95, 98; Doc. 96 at ¶¶ 95, 98. Third, the contracts between NVC and the FCPs in the record do not have exclusivity clauses. Fourth, the FCP's traffic appears to have been handled similarly to other NVC customers. With regard to the fifth and sixth factors, the NVC–FCPs agreements are not traditional telecommunications agreements, but this is access stimulation involving FCPs, and there is no evidence of some sort of non-disclosure or hiding of this from the FCC or AT&T. See Farmers II, 24 FCC Rcd. at 14806–13. Although the four FCPs are paid a fixed marketing fee each month that is more than the fee they pay for telecommunications services, the monthly telecommunications charges will vary with usage. Doc. 93 at 35; Doc. 86 at ¶¶ 97–116; Doc. 96 at ¶¶ 97–116. Each Telecommunication Services Agreement contains an accompanying pricing schedule that changes the amount owed for telecommunications services depending upon contract term length and peak monthly voice port usage. Doc. 93 at 35; Doc. 96 at ¶ 97. The

---

[9] These factors are set forth in footnote 8 of this Opinion and Order.

[10] Those charges are the same type as what the three FCPs for which AT&T "is not moving for refunds" pay. Doc. 85 at 37 n.43. Compare Doc. 79-11 at 14, with Doc. 79-11 at 23; see also Doc. 79-13 at 39–45; Doc. 81-3 at 83; Doc. 96 at ¶¶ 75–76, 118.

.

FCPs are required to pay whatever amount is owed each month, even if that would result in a net payment to NVC. Doc. 93 at 35; Doc. 86 at ¶¶ 95–96; Doc. 96 at ¶¶ 95–96. Although AT&T is correct in pointing out that this situation has not occurred, the possibility is present each month. Doc. 109 at 23 n.20. Unlike past FCC orders involving contracts labeled "telecommunications services" in name only, NVC's billing and service records with the FCPs for telecommunications services appear to be completely above-the-board. See Doc. 86 at ¶¶ 98, 101; Doc. 96 at ¶¶ 98, 101; Sancom, 28 FCC Rcd. at 1990 (finding that where a CLEC–FCP contract for telecommunications services existed, but the CLEC did not send regular invoices to FCPs, did not engage in collection actions, and fees were never paid to the CLEC because of an alleged "offsetting" process, the FCPs were not end users).

Finally, although AT&T urges this Court to compare NVC's practices to the "sham" cases where the FCC has found violations of § 201(b) of the Telecommunications Act without any specific regulations violations, the undisputed material facts show that NVC is not engaged in a sham operation. Unlike in the All American, YMax, and Total Telecomm line of cases, NVC's Tariff and FCP arrangements are drafted to comply with, and not to evade, FCC regulations and orders. Indeed, NVC has Telecommunications Service Agreements and Marketing Agreements with at least three FCPs where the FCPs are not receiving a higher fixed marketing fee than paying in telecommunications fees. See Doc. 86 at ¶ 118; Doc. 96 at ¶ 118. Although the FCC has characterized access stimulation as a wasteful arbitrage practice, the business model is still legal under existing regulations, and NVC's FCPs are paying fees for telecommunications services, making them end users under NVC's Tariff.[11] See Connect Am.

---

[11] The closest Eighth Circuit case does not address this issue because the CLEC settled with the IXC prior to resolving this claim. See Qwest Commc'ns v. Free Conferencing Corp., 837 F.3d 889, 895 (8th Cir. 2016). Unpublished district court decisions from within the Eighth Circuit are

Fund Order, 26 FCC Rcd. at 17879 ("A ban on all revenue sharing arrangements could be overly broad, and no party has suggested a way to overcome this shortcoming.") (footnote omitted).

AT&T also argues for refunds on the access charges paid for intrastate traffic because NVC's FCPs are not end users within the meaning of an intrastate tariff. Doc. 85 at 44. AT&T reasons that NVC's intrastate traffic follows the "rates, terms and conditions of Local Exchange Carrier Association, Inc. Tariff No. 1;" that the LECA tariff defines "end users" as "any *customer* of an interstate or foreign telecommunications service that is not a carrier;" and the tariff defines "customer" as an entity "which subscribes to services *offered under this tariff*." Doc. 85 at 44–45; see Doc. 1-3. According to AT&T, none of the FCPs subscribed to a service under the LECA tariff, but rather made payments to NVC pursuant to negotiated contracts. Thus, AT&T reasons that the FCPs are not customers under the LECA tariff and AT&T is entitled to a refund of all access charges paid on intrastate traffic because NVC is barred from collecting the transport charges associated with intrastate traffic. Doc. 85 at 45. NVC responds that AT&T is wrongly collapsing the definitions of "end users" and "customers" together. Doc. 93 at 36–37. NVC points to the definition of switched access service—where a LEC "terminate[s] calls from a customer designated premises to an end user's premises"—as evidence that customer means an IXC, not an end user required to purchase services under the tariff. Doc. 93 at 36; Doc. 81-44 at 5. NVC argues that AT&T's interpretation of the two definitions wrongly puts "end users" in the same category as "'Customer' – capital C." Doc. 93 at 36. NVC also notes that there is nothing for an "end user" to subscribe to under the LECA tariff, other than a one-time $5 charge for pre-subscribing to a long distance carrier; and further that the

---

not contrary to this Court's decision. See AT&T Corp. v. Aventure Commc'n Tech., LLC, No. 4:07-cv-00043-JEG., 2016 WL 5340680, at *42–44 (S.D. Iowa Sept. 19, 2016); Great Lakes Commc'ns Corp., 2015 WL 3948764, at *6.

LECA Tariff has two examples of a customer—interexchange carriers and other telecommunications carriers. Doc. 93 at 36–37. AT&T responds that a customer could subscribe to a one-time fee under the LECA tariff and argues for its reading of the LECA tariff. Doc. 109 at 24 n.22. Finally, AT&T argues that the FCC in Farmers II required FCPs to subscribe to services under a similar tariff to qualify as end users for which the LEC could bill the IXC for access charges. Doc. 109 at 23; Farmers II, 24 FCC Rcd. at 14806 & n.49.

In the Farmers line of cases, the relevant portions of the tariff at issue were published by the National Exchange Carrier Association, Inc., which gives small telecommunications carriers the option of utilizing a national pre-printed tariff, rather than creating their own. See Farmers I, 22 FCC Rcd. at 17974.

> Under Farmers' tariff: (1) "switched access" means a service that allows an IXC "to terminate calls from a customer designated premises to an *end user's* premises." NECA Tariff § 6.1 (emphasis added). (2) The term "end user" means "any *customer . . .* that is not a carrier." *Id.* § 2.6 (emphasis added). (3) "Customer" means an entity that "*subscribes* to the services offered under th[e] tariff." *Id.* (emphasis added). The Commission therefore determined that Farmers may provide and bill for switched access service only when it delivers a call to an entity that "subscribes" to that service under its tariff.

Farmers & Merchs. Mut. Tel. Co. v. FCC, 668 F.3d 714, 719 (D.C. Cir. 2011). This excerpt illustrates the confusing nature of using both customer and end user in the text. In both Farmers I and Farmers II, the FCC considered whether there was a "subscriber relationship" between the LEC and FCP by considering whether the structure of the individual contract terms and a host of other factors looked like a relationship under tariffed services. See Farmers & Merchs. Mut. Tel. Co., 668 F.3d at 720. In Farmers I, before evidence of fraud had been revealed, the FCC identified that the FCPs had "subscribe[d], *i.e.,* enter[ed] their names for, Farmers' tariffed services." Farmers I, 22 FCC Rcd. at 17988. In Farmers II, in determining that the FCPs were not end users subscribing to services offered under the tariff, the FCC considered

the payment for service from the FCPs to Farmers; whether Farmers treated the FCPs as it did its other customers; whether Farmers' contracts with the FCPs contained an exclusivity clause; whether the FCPs traffic was handled differently than Farmers' other customers; whether the agreements between the FCPs and Farmers resembled traditional agreements for tariffed service; and whether there was a timely reporting of the services by Farmers to the FCC. Farmers II, 24 FCC Rcd. at 14806–13; see Sancom, 28 FCC Rcd. at 1990–93. Those same factors, analyzed above, justify finding the four FCPs at issue to be end users and in turn customers for purposes of applying the tariff to the extent lawful to AT&T. By contrast, the FCC explained in Farmers II that the FCPs there "did not subscribe, nor did they seek to subscribe, to the services offered under the tariff. To the contrary, the evidence demonstrates that the conference call companies and Famers expressly structured their telecommunications service contracts *to avoid* strict adherence to the terms of Farmers' filed tariff." Farmers II, 24 FCC Rcd. at 14805. There is no evidence here that NVC was seeking to avoid adherence to tariffs in its dealings with the FCPs or that it engaged in any type of fraud. For the reasons explained above, the FCPs qualify as end users under Farmers I, Farmers II, and Sancom, for purposes of NVC charging a properly benchmarked rate to CenturyLink for equivalent services, and nothing in the LECA alters that conclusion.

AT&T also argues that there is a question of fact whether one other FCP is paying a fee for telecommunications services. See Doc. 85 at 37 n.43; Doc. 99 at 36–38. AT&T argues that because NVC charges this FCP a monthly fee for telecommunications under a "single, composite port charge," that charge necessarily includes services that are not telecommunications services, such as "for electric power, for fire protection, and for rental of space in NVC's buildings." Doc. 99 at 37. AT&T asserts that "after removing the charges for services that are not

telecommunications, the base marketing fee that NVC pays to [the FCP] exceeds the fees [the FCP] pays NVC for telecommunications, thus rendering the 'fee' paid by [the FCP] illusory, for the same reasons set forth above for the four FCPs." Doc. 99 at 37. For the reasons set forth above regarding the four challenged FCPs, AT&T's argument does not create a genuine issue of material fact on this issue. Because the fifth FCP pays a telecommunications fee and is an end user under the Farmers II analysis, that FCP is an end user as a matter of law.

### 4.    Dispute Resolution Clause

NVC argues that an independent basis for summary judgment on various claims is AT&T's failure to comply with the dispute resolution provision in NVC's Tariff. Doc. 87 at 38. NVC argues that because its dispute resolution provision was part of a "deemed lawful" tariff, AT&T waived its right to challenge the accuracy of the invoices by failing to provide the proper written notice of dispute. See Doc. 87 at 38–47. AT&T responds that NVC's dispute resolution provision is unenforceable, and alternatively that AT&T complied or substantially complied with the provision. Doc. 99 at 42–51; see Great Lakes Commc'ns Corp., 2015 WL 12551192, at *10–11 & n.19 (expressing doubt that any billing dispute provision that required the payment of charges in dispute could be reasonable, because "it would give an LEC carte blanche to abuse the system by blackmailing buyers into paying for all erroneous charges, no matter how egregious"). This Court does not need to rule on the enforceability of the dispute resolution provision because AT&T gave NVC sufficient notice of the billing dispute.

NVC's dispute resolution provision is found in section 3.1.7 of its Tariff. Doc. 1-1 at 42. This provision requires that written notice be sent to NVC's "Company contact," James Groft, in the event of a dispute. Doc. 1-1 at 42. The notice must contain documentation required to investigate the dispute, which includes "the account number under which the bill has been

rendered, the date of the bill, and the specific items on the bill being disputed." Doc. 1-1 at 42. Further, a "separate letter of dispute must be submitted for each and every individual bill" in dispute. Doc. 1-1 at 42.

AT&T ceased paying NVC's full invoices beginning with the March 2013 invoice. Doc. 87 at 43–44. On April 12, 2013, a billing representative from AT&T emailed NVC's chief financial officer to inform her that AT&T would be withholding payment until it could "determine the nature of the nearly 200% increase in traffic[12] to your switches since December." Doc. 87 at 39; Doc. 88 at ¶ 37; Doc. 100 at ¶ 37. Later, AT&T informed an individual in NVC's accounting department that it rejected any duplicate billing from NVC for the transport it received from SDN between Sioux Falls and Groton.[13] Doc. 87 at 41; Doc. 88 at ¶ 65; Doc. 100 at ¶ 65. NVC argues that both because these notices were sent to the wrong individual and because AT&T did not provide sufficient documentation to investigate the dispute, it failed to comply with NVC's written notice requirement. Doc. 87 at 39. However, NVC admits that the "Company contact," James Groft, read and responded to the AT&T–SDN issue, and Mr. Groft was involved in settlement discussions with AT&T regarding the first issue. See Doc. 87 at 41; Doc. 99 at 46–47; Doc. 88 at ¶¶ 50, 66. AT&T did not waive objection to NVC's billing statements. NVC was duly informed of the dispute beginning in April 2013. See Doc. 88 at ¶¶ 35–37. NVC was not prejudiced by any deficiency in the notice of a billing dispute from AT&T, and it is hard to conceive that a different type of notice, or continuing notice on a monthly basis, from AT&T would have had any impact on this dispute. AT&T has adequately

---

[12] This increase in traffic may have been attributable to a change in AT&T's practices. See Doc. 88 at ¶¶ 38–39; Doc. 100 at ¶¶ 38–39.

[13] AT&T's grounds for disputing the billing have expanded from April of 2013 to its positions in this case, but the absence of initial notice about AT&T's sundry arguments for non-payment of the billings caused no significant prejudice to NVC.

complied with the billing dispute provision as a matter of law. See generally N. States Power
Co. v. ITT Meyer Indus., 777 F.2d 405, 409–10 (8th Cir. 1985); GSAA Home Equity Trust
2006-2 ex rel. LL Funds LLC v. Wells Fargo Bank, N.A., 133 F. Supp. 3d 1203, 1216 (D.S.D.
2015); Great Lakes Commc'ns Corp., 2015 WL 12551192, at *11.

### 5.   Effect of NVC–SDN Lawsuit

NVC is entitled to charge AT&T based on the NVC tariff, so long as NVC has not
spurned an unconditional offer to install a direct trunk connection at AT&T's cost. The ultimate
resolution of how much AT&T owes NVC appears to depend on the outcome of an ongoing
lawsuit between NVC and SDN, with AT&T as an interested party. See James Valley Coop.
Tel. Co. v. South Dakota Network, LLC, No. 06-CIV15-000134 (5th Cir. Ct. S.D.); Doc. 111-2.
AT&T argues that it is not responsible for any transport charges after September 2014 between
Sioux Falls and Groton because SDN, rather than NVC, was providing that transport pursuant to
a negotiated agreement with AT&T. Doc. 85 at 32. Despite AT&T's arguments to the contrary,
it is a material issue whether SDN had the ability to enter into an agreement with AT&T or had a
binding agreement with NVC such that it could not. See Doc. 85 at 34. After all, the FCC has
deemed it a violation of 47 U.S.C. § 201(b) for a LEC to bill an IXC for transport services that
offered no advantages to the IXC. See AT&T Corp. v. Alpine Commc'ns, LLC, 27 FCC Rcd.
11511, 11529 (2012). Thus, if AT&T and SDN have a valid agreement under which SDN is
providing to AT&T the transport services between Groton and Sioux Falls, NVC cannot collect
for that service. Therefore, this Court at this time denies granting either motion for summary
judgment on the effect of the AT&T–SDN agreement.

## B. Alternative State Law Claims

Because this Court has found that NVC provided AT&T with services within the confines of NVC's Tariff, NVC as a matter of law is not entitled to recover under either quantum meruit or unjust enrichment. See Northern Valley Commc'ns, LLC, 2015 WL 11675666, at *5–6; Northern Valley I, 26 FCC Rcd. at 8335; see generally Iowa Network Servs., Inc. v. Qwest Corp., 466 F.3d 1091, 1098 (8th Cir. 2006). AT&T thus is entitled to summary judgment on those claims.

## III.   Conclusion and Order

For the reasons explained above, it is hereby

ORDERED that unless NVC spurned an unconditional offer from AT&T for AT&T to install a direct link at AT&T's cost as detailed in this Opinion, NVC's Motion for Summary Judgment on Count I of its Complaint is granted in part as it relates to transport charges from Groton to Redfield and Aberdeen, to other end user locations, and between Groton and Sioux Falls prior to the AT&T–SDN agreement. It is further

ORDERED that NVC's Motion for Summary Judgment on Count I of its Complaint is denied at this time as it relates to transport charges between Sioux Falls and Groton after the AT&T–SDN agreement as there exists a genuine issue of material fact. It is further

ORDERED that AT&T's Motion for Summary Judgment is denied as to Count I of NVC's Complaint. It is further

ORDERED that AT&T's Motion for Summary Judgment on NVC's state law claims of quantum meruit and unjust enrichment in Counts II and III of the Complaint is granted. It is further

ORDERED that summary judgment for either party on NVC's Count IV for a declaratory ruling is denied at this time. It is further

ORDERED that AT&T's Motion for Summary Judgment on Counts I, II, and III of its counterclaim is denied. It is further

ORDERED that NVC's Motion for Summary Judgment on AT&T's Counterclaim is granted in part and denied in part. It is further

ORDERED that AT&T's Motion to Strike, Doc. 114, is denied as moot in that the filed document made little difference to the Court's analysis and AT&T had an opportunity to respond and argue further thereafter at the hearing on the cross-motions for summary judgment. It is further

ORDERED that the parties cooperate to calculate the amount AT&T owes to NVC based on the rulings in this Opinion and Order, and if they cannot or will not do so, then submit to this Court a joint proposal for how to present that issue for resolution. It is finally

ORDERED that once the parties, or if necessary the Court, has determined how much AT&T owes to NVC based on rulings in this Opinion and Order, the Court will take up whether it makes sense to stay the remaining issue in this case pending the outcome in the NVC–SDN lawsuit.

DATED this 28ᵗʰ day of March, 2017.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE

40